UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
MARQUISE SIMMONS,                                              :

                                   Plaintiff,                  :        12 Civ. 1061 (PAC) (DF)

                          -against-                            :        **REPORT AND**
                                                                        **RECOMMENDATION**
MR. ROBERT N. CRIPPS, Warden of Anna M. Kross                  :
Center (C-95); DORA B. SCHRIRO, Commissioner
of the N.Y.C. D.O.C.; WARDEN of the Otis Bantum               :
C. Center; WARDEN of G.M.D.C. (C-73),                          :

                                   Defendants.                 :
------------------------------------------------------------------X

┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #: _____               │
│ DATE FILED: 2/15/13                  │
└─────────────────────────────────────┘

**TO THE HONORABLE PAUL A. CROTTY, U.S.D.J.:**

In this *pro se* prisoner litigation, brought pursuant to 42 U.S.C. § 1983, the Court

previously dismissed, *sua sponte*, claims that plaintiff Marquise Simmons ("Plaintiff") had

asserted against the Mayor and Police Commissioner of New York City. (*See* Dkt. 9.)

Plaintiff's remaining claims are asserted against the Commissioner of the New York City

Department of Correction ("DOC") and the wardens of certain DOC facilities on Rikers Island

("Rikers"), specifically, the wardens of the Anna M. Kross Center ("AMKC"), the Otis Bantum

Correctional Center ("OBCC"), and the George Motchan Detention Center ("GMDC").[1]

Plaintiff alleges that these remaining defendants (collectively referred to herein as "Defendants")

violated his constitutional rights under the Sixth, Eighth, and 14th Amendments, principally by

---

[1] Plaintiff names the DOC Commissioner as Dora B. Schriro ("Schriro"), and the Warden
of the AMKC as Robert N. Cripps ("Cripps"). Plaintiff does not identify the other wardens by
name, but rather identifies them only as the wardens of the specified facilities.

subjecting him to certain unlawful conditions of confinement.  (*See* Complaint, dated Jan. 10, 2012 ("Compl.") (Dkt. 2), at 4.[2])

Currently before this Court for a report and recommendation are two motions:  first, Defendant's motion to dismiss the Complaint against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (*see* Notice of Motion, dated June 7, 2012 (Dkt. 12)), and, second, Plaintiff's motion to convert Defendant's Rule 12(b)(6) motion to one for summary judgment (*see* Notice of Motion, dated July 27, 2012 (Dkt. 26)).  For the reasons discussed below, I recommend that, although Plaintiff's Complaint is defective in several respects, Defendants' motion to dismiss (Dkt. 12) be granted only in part, and that, as to any remaining claims, Plaintiff be given 30 days to amend his Complaint to cure the defects described herein. If Plaintiff fails to do so, then I recommend that the remainder of his Complaint be dismissed at that time.  I further recommend that Plaintiff's pending motion (Dkt. 26) be denied, both because the Complaint, as pleaded, cannot withstand scrutiny and because it would be premature for the Court to consider Defendants' arguments in a summary-judgment context, without a more complete evidentiary record.

## BACKGROUND

### A.    Factual Background[3]

On some date prior to January 10, 2012, Plaintiff was arrested and then taken to Rikers (*see* Compl., at 2-3, 4; Dkt. 26, at 3), where he was detained until approximately July 2012 (*see*

---

[2] The pages of the Complaint are not numbered.  For ease of reference, this Court has assigned page numbers to the pages of that document.

[3] Unless otherwise noted, the facts set forth herein are taken from Plaintiff's Complaint and his submissions in opposition to Defendants' Motion To Dismiss (Dkts. 26 and 27), and are accepted as true for purposes of Defendants' motion.  (*See* Discussion *infra* at I(A).)

Notice of Change of Address, dated Aug. 11, 2012 (Dkt. 22)).  Plaintiff claims that, at different

times during this period of detention, he was housed in the AMKC, the OBCC, or the GMDC.  It

was at one or more of these facilities that, as set forth below, Defendants allegedly violated

Plaintiff's constitutional rights by (1) subjecting him to unsanitary and overcrowded living

conditions, (2) confining him in dilapidated facilities, (3) providing him with inadequate food,

clothing, and amenities, (4) subjecting him to mistreatment by prison guards and staff members,

and (5) subjecting him to illegal body searches.

### 1.   Confinement in Unsanitary and Overcrowded Facilities

Plaintiff alleges that, during his periods of incarceration at the AMKC, the OBCC, and

the GMDC, he was subjected to unsanitary living conditions.  (*Id.* at 4, 9-10.)  In general,

Plaintiff alleges that these facilities were infested with vermin, including rats and roaches, and,

in the case of the OBCC, that its showers were infested by maggots and leeches (*id.* at 4, 9); that

the sinks, showers, and toilets at the facilities were routinely clogged with bodily waste and

vomit (*id*. at 10), and that the facilities' maintenance staffs refused to unclog these bathroom

fixtures (*id*.).

Plaintiff contends that the alleged lack of cleanliness at these three facilities was due, at

least in part, to facility overcrowding.  (*See id.* at 10 (claiming that certain "hygienical issues

[were due] to housing units being overcrowded").)  Plaintiff claims that neither the AMKC, the

OBCC, nor the GMDC "provide[d] 60 square feet," and that "the beds [in these facilities] [were]

less than [three] feet apart."  (*Id*. at 4.)  According to Plaintiff, "in OBCC it [was] 60 detainees to

a house on the main side of the building," even though that section of the facility was supposed

to house only 50 detainees.  (*Id.* at 4, 9.)  Plaintiff claims that, as a consequence of housing 10

extra detainees, "most of the time [there were only three] operable sinks, toilets, and showers."

(*Id.* at 9.)  According to Plaintiff, the allegedly overcrowded conditions that he describes in his

pleading violated consent decrees and orders issued by the Honorable Morris E. Lasker, formerly

of this Court (*see id.* at 6; *see also* Discussion *infra*, at III(B)(1)), and violated "Minimum

Standards" prison regulations (*see* Compl., at 6 (citing "1-04: #3," which presumably refers to

40 R.C.N.Y. § 1-04(c)(3)); *see also* Discussion *infra*, at III(B)(2)).

This Court notes that, in his Complaint and opposition submissions, Plaintiff does not

state the length of his exposure to these allegedly unsanitary and overcrowded living conditions.

Nor does he allege that these conditions caused him to suffer any physical injury.  Rather, in the

section of the *pro se* form Complaint that calls for Plaintiff to state his injuries, Plaintiff simply

reiterates, *inter alia*, his allegations regarding the unsanitary and overcrowded conditions that

existed at the AMKC, the OBCC, and the GMDC.  (*See* Compl., at 4.)

### 2. <u>Confinement in Dilapidated Facilities</u>

According to Plaintiff, he was housed in facilities that were in disrepair.  He describes the

AMKC, the OBCC, and the GMDC as water-damaged, rusty, and "falling apart."  (*Id.* at 10-11.)

Similarly, he contends that, because certain "filters" were not changed, the showers and drinking

fountains at these facilities produced "greyish water."  (*Id.* at 10.)  Plaintiff specifically alleges

that, as a result of his exposure to and/or consumption of this water, he developed "boils,"

"burns," "stomach pains," and "headaches" (Dkt. 27, at 3), and that other prisoners who were

similarly exposed suffered various illnesses and dry skin (*see* Compl., at 10.)  He further claims

that the ceilings at the OBCC and the GMDC leaked foul-smelling, dirty water, causing

fragments of plaster to fall from the ceilings.  (*Id.*)  Plaintiff also claims that rust and dust were

prevalent throughout the AMKC.  (*See id*. at 11.)  According to Plaintiff, these conditions made

the air in the AMKC "stifling and hard to breathe," leading to "headaches, sore throats, allergic

4

reactions, itchy skin, [and] dry eyes." (*Id.*)  Plaintiff, however, does not clearly allege that he, personally, suffered any physical reaction to the contaminated air that he describes.

### 3.      Confinement in Facilities That Provided Inadequate Food, Clothing, and Amenities

Plaintiff claims that the AMKC, the OBCC, and the GMDC provided him with inadequate food, clothing and amenities.  As to food, Plaintiff alleges that these facilities subjected him to a shortage of food rations and eating utensils (*id.*); that he was often provided with "freezer burnt" or spoiled food (*id.* at 4, 6); and that the facilities served beverages to the prisoners in jugs that often had "pieces of food, old Kool Aid," and other matter lodged in their caps (*id.* at 10).  Plaintiff also alleges that the AMKC served food on dirty trays (*id.* at 11), and that its staff frequently neglected to give him fruit with his meal, and occasionally failed to provide condiments, such as butter (*id.* at 11).  Plaintiff claims that, as a result of these alleged acts and omissions, he suffered "mental and emotional deprivation."  (*Id.* at 4.)  Once again, however, Plaintiff's claim of injury does not include any specific physical component.  (*See id.*)

As to his clothing, Plaintiff claims that his prison-issued shoes wore out within two weeks of the date he received them, and that they did little to protect him against rain and cold. (*Id.* at 9.)  Plaintiff also claims that the AMKC, the OBCC, and the GMDC failed to meet "minimum standards requirements" (*id.* at 4), by failing to launder "the prisoner population's clothing" (*id.*), to provide prisoners with detergent (*id.*), to allow prisoners to dry their own clothes on "home made clotheslines" (*id.* at 9), and to wash the prisoners' sheets and towels on a weekly basis (*id.*).  Plaintiff also claims that the AMKC and the GMDC failed to give him a pillow and a mattress cover.  (*Id.*)  The Complaint, though, is devoid of any claim that Plaintiff suffered any injury as a result of being deprived of laundering services, clothing, and/or linens.

### 4.   Mistreatment by Security Guards and Other Facilities Staff

Plaintiff alleges that he was subjected to mistreatment at the hands of the prison guards and staff members of the AMKC, the OBCC, and the GMDC.  More specifically, Plaintiff alleges that, during inclement weather, the "prisoner population [was] not allowed to utilize the gymnasium due to the officers and brass using the gyms." (*Id.* at 4, 9.)  Plaintiff further alleges that "some officers . . . solicit[ed] drugs, tobacco, and other unlawful items to the population of prisoners [in] exchange for cash, intimacy and other favors." (*Id.* at 4.).  Plaintiff also asserts that the mail-room staffs of the three facilities destroyed certain outgoing mail items that were sent by certain prisoners.  (*Id.*)

Finally, Plaintiff alleges that, on January 7 and 9, 2012, he was "stripped frisk[ed]." (*Id.* at 11.)  Petitioner further alleges that he is an "Islamic detainee" (*id.* at 11), and he appears to claim that, under "Directive 4910,"[4] it was illegal to subject him to such strip searches (*id.* at 4).  Plaintiff also suggests that he was improperly "forced to strip bare" during so-called "pat frisks," although he does not allege that these "pat frisks" were illegal under any particular City regulation.  (*Id.* at 5.)

It should be noted that Plaintiff fails to identify even a single prison guard or staff member as being the perpetrator of any of these alleged acts of mistreatment.  Nor, again, does Plaintiff allege that any of these acts caused him to suffer a physical injury.  Rather, Plaintiff alleges that he sustained "verbal and psychological abuse" at the hands of "the staff." (*Id.* at 4.)

---

[4] This presumably refers to State of New York Department of Correctional Service Directive No. 4910, Control of and Search for Contraband (hereinafter "Directive 4910") (discussed *infra* at III(B)(5)).

B.     **Procedural History**

1.     **Plaintiff's Grievances**

Plaintiff claims that he filed grievances at the AMKC, the OBCC, and the GMDC" (*id.* at 5), in each case complaining about the conduct and conditions that are the subject of his Complaint in this action (*see id.*).  According to Plaintiff, he received no responses to any of the grievances that he purportedly filed.  (*See id.*)  Plaintiff suspects that the grievances were simply ignored.  (*See id.*)  In his Complaint, Plaintiff acknowledges that he did not file any appeal with respect to his grievances, but suggests that his lack of action was justified, as "[t]here wasn't [*sic*] any Decisions to appeal [b]ecause []the [Inmate Grievance Review Committee] [p]rocess doesn't provide steps for ignored Grievances."  (*Id.*)  In a somewhat different formulation, Plaintiff states, in one of his opposition submissions, that he exhausted "all known remedies." (Dkt. 26, at 3.)  Plaintiff also alleges that he filed "several outside grievances" (Compl., at 6), in that he gave notice of his various complaints to Commissioner Schriro, the New York City Board of Correction, and the "Brass" at the facilities where he was being detained (*id.*).  Other than referencing Schriro, however, the Complaint does not identify any particular individuals to whom Plaintiff gave notice of his grievances, nor does it state when or how Plaintiff gave such notice.

2.    **Plaintiff's Lawsuit**

On January 10, 2012, Plaintiff filed his Complaint in this action.  (*See id.* at 2.)[5]  As noted

above, Plaintiff named, as defendants, not only Schriro and the wardens of the Rikers facilities

where Plaintiff had been held, but also Michael Bloomberg ("Bloomberg"), Mayor of the City of

New York, and Raymond Kelly ("Kelly"), Commissioner of the Police Department of the City

of New York.  On April 5, 2012, however, the Honorable Paul A. Crotty, U.S.D.J., *sua sponte*

dismissed Plaintiff's claims against Bloomberg and Kelly.  (*See* Order of Service, dated Apr. 5,

2012 (Dkt. 9).)

On June 28, 2012, the remaining defendants (*i.e.*, those identified as "Defendants" for

purposes of this Report and Recommendation) moved to dismiss the Complaint in its entirety.

(Dkt. 12.)  Given that one of the principal bases of the motion was Plaintiff's purported failure to

exhaust, this Court, on August 3, 2012, conducted a pre-trial conference and ordered Defendants

to "produce any documents in their possession, custody, or control constituting or relating to

grievances filed by Plaintiff concerning the matters referred to in his Complaint in this action."

(Order, dated Aug. 3, 2012 ("8/3/12 Order") (Dkt. 17).)

On August 29, 2012, this Court received two filings from Plaintiff.  In his first-docketed

filing, a "Notice of Motion" (Dkt. 26), Plaintiff asks the Court to convert Defendants' motion

"into a motion for summary judgment" (*id.*).  In his second-docketed filing (Dkt. 27), also styled

---

[5] Under the so-called "prison mailbox rule," a *pro se* prisoner's papers are deemed filed
when they are handed over to prison officials for forwarding to the Court.  *See Houston v. Lack*,
487 U.S. 266, 270 (1988).  Therefore, although Plaintiff's Complaint was not entered on the
Court's docket until February 9, 2012, the Court will consider it to have been filed as of
January 10, 2012, the date it was signed by Plaintiff.  *See, e.g.*, *Luna v. Artus*, No. 10 Civ. 2565
(PKC) (KNF), 2010 WL 2594303, at *1 n.1 (S.D.N.Y. June 18, 2010) (citing *Noble v. Kelly*, 246
F.3d 93, 97-98 (2d Cir. 2001).

as a "Notice of Motion," Plaintiff makes legal arguments, both in opposition to Defendants'

motion to dismiss, and in connection with a potential summary judgment determination by the

Court (*see id.* (including a statement of undisputed facts pursuant to Local Civil Rule 56.1)).  For

the most part, Plaintiff's second submission is appropriately characterized as a memorandum of

law in opposition to Defendants' motion, and this Court will treat it as such.  As of this date,

Defendants have filed no reply.

## DISCUSSION

## I.  RULE 12(b)(6) STANDARDS

In deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

Procedure, the Court "accept[s] as true all factual statements alleged in the complaint and

draw[s] all reasonable inferences in favor of the non-moving party."  *McCarthy v. Dun &*

*Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007) (citation omitted); *accord Jaghory v. New*

*York State Dep't of Ed.*, 131 F.3d 326, 329 (2d Cir. 1997) (citations omitted).  The Court's

function on a motion to dismiss is "'not to weigh the evidence that might be presented at a trial

but merely to determine whether the complaint itself is legally sufficient.'"  *Velez v. Levy*, 401

F.3d 75, 80 (2d Cir. 2005) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)).

Additionally, "[i]t is well established that the submissions of a *pro se* litigant must be

construed liberally and interpreted to raise the strongest arguments that they suggest."

*Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks

and citations omitted); *see also Hughes v. Rowe*, 449 U.S. 5, 9-10 (1980) (noting that a *pro se*

party's pleadings must be liberally construed in his favor and are held to a less stringent standard

than the pleadings drafted by lawyers (citations omitted)).  At the same time, "conclusory

allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a

9

motion to dismiss." *Achtman v. Kirby, McInerney, & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (citation omitted).  Even plaintiffs who are proceeding *pro se* must comply with procedural and substantive rules, and, to survive a motion to dismiss, a *pro se* complaint, like any other complaint, "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)); *Bisson v. Martin Luther King Jr. Health Clinic*, No. 07-5416-cv, 2008 WL 4951045, at *1 (2d Cir. Nov. 20, 2008).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

On a motion to dismiss, the Court is generally limited to reviewing the allegations in the complaint and documents attached to it or incorporated by reference.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-55 (2d Cir. 2002).  The Court may, however, consider documents "'integral to the complaint'" or those that were necessarily relied on by the plaintiff in drafting the complaint.  *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (emphasis omitted) (quoting *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991)).

## II.   DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CLAIMS FOR LACK OF EXHAUSTION

In support of their motion to dismiss, Defendants first argue that it is clear from the face of Plaintiff's Complaint that he has failed to satisfy the exhaustion requirements of the Prison Litigation Reform Act, 42 U.S.C. § 1997e ("PLRA"), and that he therefore cannot maintain his claims in this Court.  (*See* Memorandum of Law in Support of Defendants' Motion To Dismiss, dated June 7, 2012 ("Def. Mem.") (Dkt. 13), at 1.)

A.      **The PLRA's Exhaustion Requirement**

The PLRA provides that "[n]o action shall be brought with respect to prison conditions

under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or

other correctional facility until such administrative remedies as are available are exhausted."  42

U.S.C. § 1997e(a).  This exhaustion requirement "applies to all inmate suits about prison life,

whether they involve general circumstances or particular episodes, and whether they allege

excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  "When a

prisoner does not properly exhaust his administrative remedies before filing suit, the action must

be dismissed."  *Mateo v. Alexander*, 08 Civ. 8797 (RJH) (DF), 2010 U.S. Dist. LEXIS 11270,

at *8 (S.D.N.Y. Feb. 9, 2010) (citing *Burgos v. Craig*, No. 06-5505, 307 Fed. Appx. 469, 470

(2d Cir. 2008) ("[Exhaustion] must be completed before suit is filed, and completing the

exhaustion requirements only after filing suit is insufficient.")).

In particular, before a prisoner incarcerated by the DOC may bring an action in this

Court, the prisoner must exhaust all of the steps of the established grievance process – in this

case, the so-called "Inmate Grievance Resolution Program" ("IGRP").[6]  *Patterson v. City of New

York*, No. 11 Civ. 7976, 2012 U.S. Dist. LEXIS 113235, at *8 (S.D.N.Y. Aug. 9, 2012) ("A

prisoner incarcerated by the DOC must exhaust all of the steps of the . . . IGRP . . . before

---

[6] The IGRP was effective from March 13, 2008 through September 10, 2012, when it was
replaced by the Inmate Grievance and Request Program in DOC Directive 3376 (2012),
available at http://www.nyc.gov/html/doc/downloads/pdf/Directive_3376_Inmate_
Grievance_Request_Program.pdf.  The IGRP was therefore the grievance program that was in
place during Plaintiff's periods of incarceration at the AMKC, the OBCC, and the GMDC.  (*See*
Compl., at 11 (alleging that certain of the conduct complained of herein occurred on specific
days in December 2011 and January 2012); Dkt. 22 (Plaintiff providing change of address and
stating, on Aug. 11, 2012, that he was no longer incarcerated at the AMKC, the OBCC, the
GMDC, or at any other Rikers facility).)

bringing an action in this court.")  The Court may take judicial notice of the requirements of the IGRP, as detailed by the DOC Directive Number 3375R–A ("IGRP Directive") and available online at http://www.nyc.gov/html/doc/downloads/pdf /pdf/3375R-A.pdf.  (*See, e.g.*, *id.*)  Pursuant to the IGRP, a prisoner was required (1) to file a grievance with the Inmate Grievance Review Committee ("IGRC"), (2) to request a formal hearing before the IGRC if either (a) the grievance is not resolved informally or (b) the prisoner has not received a response within five days, (3) to appeal an IGRC response to the appropriate commanding officer or designee; (4) to appeal a commanding officer's or designee's response to the DOC Central Office Review Committee ("CORC"); and (5) to appeal the CORC decision to the New York City Board of Correction.  *See* IGRP Directive ¶ IV(B).  Under the IGRP, where a grievance was not decided within the time limits set forth under the program, the prisoner could appeal that grievance to the next step.  *See* IGRP Directive ¶ IV(C)(6).

Before bringing suit, an inmate must not just file an initial grievance, but rather must exhaust his claims through each level of the grievance process.  *See Booth v. Churner*, 532 U.S. 731, 736-38 (2001); *Mateo v. Alexander*, 2010 U.S. Dist. LEXIS 11270, at *8-10.  As dismissal on the basis of failure to exhaust is mandatory, an inmate's claims can only proceed in this Court if, as to each claim, he has exhausted all available administrative remedies, including all appellate remedies provided within the DOC system.  *See Porter*, 534 U.S. at 524 (citing *Booth*, 532 U.S. at 739); *see also Banks v. Mental Health Clinicians*, No. 11 Civ. 7848 (LAP), 2012 U.S. Dist. LEXIS 176880, at *10-11 (S.D.N.Y. Dec. 11, 2012) (granting defendants' motion to dismiss, with prejudice, where plaintiff, an inmate at a Rikers detention center, failed to exhaust the DOC administrative grievance process prior to filing his lawsuit, and thereby failed to meet the requirements of the PLRA); *Price v. City of New York*, No. 11 Civ. 6170 (TPG), 2012 U.S.

Dist. LEXIS 123990, at *7 (S.D.N.Y. Aug. 30, 2012) ("It is clear from the face of the complaint

that plaintiff [an inmate formerly housed in a facility on Rikers Island] has failed to exhaust the

administrative remedies available to him.  As such, plaintiff[']s complaint should be dismissed

under Rule 12(b)(6) for failure to state a claim on which relief can be granted.").  The PLRA

requires "proper exhaustion," which means "using all steps that the agency holds out, and doing

so properly (so that the agency addresses the issues on the merits)."  *Woodford v. Ngo*, 548 U.S.

81, 90 (2006) (internal quotation marks and citation omitted).  "Proper exhaustion demands

compliance with an agency's deadlines and other critical procedural rules."  *Id.*  Therefore,

"untimely or otherwise procedurally defective administrative grievance[s] or appeal[s]" do not

satisfy the PLRA's exhaustion requirement.  *Id.* at 83-84.

        The exhaustion requirement may, however, be excused under certain limited

circumstances.  Under the law of this circuit, the Court must engage in a three-part inquiry to

determine whether an inmate's suit should be dismissed for failure to satisfy the PLRA's

exhaustion requirement.  *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004).  First, the

Court should ask whether administrative remedies were, in fact, "available" to the plaintiff.  *Id.*

Second, the Court should "inquire as to whether the defendants may have forfeited the

affirmative defense of non-exhaustion by failing to raise or preserve it, . . . or whether the

defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more

of the defendants from raising the plaintiff's failure to exhaust as a defense."  *Id.* (citations

omitted).  Finally, the Court should "consider whether 'special circumstances' have been

plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.'" *Id.* (quoting *Giano v. Goord*, 380 F.3d 670, 676 (2d Cir. 2004)).[7]

As the "failure to exhaust is an affirmative defense under the PLRA, . . . inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock*, 549 U.S. 199, 216 (2007).  Where, however, a plaintiff concedes lack of exhaustion, or non-exhaustion is otherwise apparent from the face of the complaint, the Court may decide the exhaustion issue on a Rule 12(b)(6) motion to dismiss.  *See Shaw v. City of New York*, No. 08 Civ. 3997 (SHS) (JCF), 2009 U.S. Dist. LEXIS 39836, at *8-9 (S.D.N.Y. Apr. 21, 2009) (citing *McCoy v. Goord*, 255 F. Supp. 2d 233, 251 (S.D.N.Y. 2003).  If non-exhaustion is *not* clear from the face of the complaint, the Court may convert the defendant's motion to one for summary judgment "'limited to the narrow issue of exhaustion and the relatively straightforward questions about the plaintiff's efforts to exhaust, whether remedies were available, or whether exhaustion might be, in very limited circumstances, excused.'"  *Mateo v. Alexander*, 2010 U.S. Dist. LEXIS 11270, at *5 (quoting *McCoy*, 255 F. Supp. 2d at 251).

---

[7] "Courts in this circuit have acknowledged the tension between *Woodford* and the *Hemphill* analysis, but have continued to use the *Hemphill* test in the absence of circuit authority to the contrary."  *Mateo v. O'Connor*, No. 08 Civ. 11053 (RJH) (DF), 2010 U.S. Dist. LEXIS 81972, at *13 n.6 (S.D.N.Y. Aug. 12, 2010) (citing cases); *see also Shariff v. Coombe*, 655 F. Supp. 2d 274, 285 n.7 (S.D.N.Y. 2009) ("There appears to be some debate as to whether the *Hemphill* three-part test survives the Supreme Court's decision in *Woodford* . . .  Although the Second Circuit has not explicitly held that *Hemphill* remains good law, it has applied the three-part inquiry in recent cases." (citing *Vogelfang v. Riverhead County Jail Officers*, No. 07-1268-cv, 2009 U.S. App. LEXIS 1914, at *5 (2d Cir. Feb. 2, 2009))).

**B.**     <u>Potential Excuse of Exhaustion in This Case</u>

Defendants contend, correctly, that, because Plaintiff was housed at Rikers (*i.e.*, in DOC facilities) at all times relevant to the Complaint, he was required to exhaust all administrative remedies that the DOC made available before bringing suit.  (Def. Mem., at 6-7.)  Defendants then argue that "it is clear from the face of the pleading that Plaintiff has not exhausted the administrative remedies available to him under the [IGRP]" (*id*. at 7), and that, for this reason, "dismissal [of the Complaint in its entirety] is required by the PLRA" (*id*.).  Based on Plaintiff's submissions, though, and given the undeveloped state of the record at this time, this Court cannot conclude that all administrative remedies that Respondent has assumed were available to Plaintiff under the IGRP were *in fact* made available to him.

In his Complaint, Plaintiff alleges that he filed grievances at the facilities where he was being detained (*see* Compl., at 5), as well as "several outside grievances" (*id*. at 6), but that, having received no responses to any of his grievances (*id*. at 5), he did not file an appeal (*id*.).  Based solely on these allegations, there appears to be little question that Plaintiff failed to follow all the steps permitted or required by the IGRP.  *See* IGRP Directive ¶ IV(C)(6) (permitting appeal when a grievance is not decided within IGRP time limits); *see also id*.¶ IV(B)(1)(d)(i); *Houston v. Horn*, No. 09 Civ. 801(DLC), 2010 U.S. Dist. LEXIS 47932, at *21 (S.D.N.Y. May 13, 2010) (holding that "having heard no response [to his initial grievance] within five working days, [plaintiff] was required to request a formal hearing" to exhaust properly under the previous grievance program).  On the other hand, Plaintiff also asserts in his Complaint that the IGRC process "[did not] provide steps for ignored Grievances" (Compl., at 5), and, in opposition to Defendants' motion, Plaintiff states that he exhausted "all known remedies" (Dkt. 26, at 3).

These allegations raise at least the suggestion that Plaintiff took all steps that were made available to him to pursue his grievances.

Where a pretrial detainee's allegations regarding exhaustion are not entirely clear, courts in this circuit have repeatedly declined to dismiss claims on exhaustion grounds, at the pleading stage.  For example, in *Patterson*, the plaintiff, a former pretrial detainee at the OBCC, alleged that his constitutional rights were violated as a result of the overcrowded conditions he was subjected to while he was detained at that facility, that the grievance he filed with the facility regarding those conditions was ignored, and, therefore, that he had "done all that [he could] with the grievance process."  2012 U.S. Dist. LEXIS 113235, at *7-10.  Although the court acknowledged that "the most reasonable inference to be drawn" from these allegations was that the plaintiff had "never requested a formal hearing on his grievance," the court, nonetheless, denied the defendants' motion to dismiss for lack of exhaustion, as the court concluded that it was possible that the plaintiff, who was proceeding *pro se*, had intended to convey that he either had exhausted the IGRP process or had an excuse for failure to exhaust.  *Id.*

Here, Plaintiff, who is also proceeding *pro se*, similarly alleges that, although he filed no appeal of his unanswered grievances, (Compl., at 5), he exhausted "all known remedies" (Dkt. 26, at 3).  Like the court in *Patterson*, this Court construes Plaintiff's allegations liberally and concludes that he may have intended to convey that he *did* exhaust his claims, or that, if he failed to do so, as Defendants contend, he may have had an excuse for that failure.  *See Patterson,* 2012 U.S. Dist. LEXIS 113235, at *7-10; *see also Roland v. Wenz*, No. 9:10-CV-0089 (GLS/DEP), 2010 U.S. Dist. LEXIS 72009, *15-16 (N.D.N.Y. May 24, 2010) (declining to dismiss for failure to exhaust where plaintiff asserted, incorrectly, that his prison did not have a grievance process (citation omitted)); *Torrence v. Pesanti*, 239 F. Supp. 2d 230, 231-33

(D. Conn. 2003) (holding that, when, on a motion to dismiss, "the failure to exhaust administrative remedies under the PLRA is suggested, but not unambiguously established," the court should not rule on the face of the pleading).

Although Plaintiff suggests that Defendants' motion be converted to one for summary judgment, no evidentiary record has been presented that would resolve the ambiguity in Plaintiff's statements as to whether a grievance appeal process was actually made available to him.  In light of Plaintiff's *pro se* status, the precedent cited above, and the fact that there has been only minimal discovery to date regarding Plaintiff's efforts to grieve his complaints, I recommend that Defendants' motion to dismiss be denied, to the extent it is based on Plaintiff's purported lack of exhaustion.  I further recommend that this denial be without prejudice to Defendants' right to raise the exhaustion issue again, on a summary judgment motion brought on a more fully-developed record, should Plaintiff's claims otherwise survive.

## III.   DEFENDANTS' CHALLENGES TO THE <br> ADEQUACY OF PLAINTIFF'S PLEADING

Defendants also seek dismissal of Plaintiff's claims against them on the grounds that the Complaint (1) fails to allege the personal involvement of the named Defendants in the alleged constitutional violations (*see* Def. Mem., at 7), (2) fails to plead facts that actually rise to the level of a constitutional violation (*see id*. at 10, 22), and (3) fails to allege facts capable of showing that Plaintiff is entitled to compensatory relief (*see id*. at 24).  Many of these arguments have merit, and certain of Plaintiff's claims simply cannot stand, and should therefore be dismissed at this time.  As Plaintiff is proceeding *pro se*, however, and as certain of his claims may have merit, the Court should not dismiss the case in its entirety, without first giving Plaintiff leave to replead any potentially viable claims.  *See Branum v. Clark*, 927 F.2d 698, 705 (2d Cir,

1991) (holding that a *pro se* litigant's complaint should not be dismissed "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated").

### A.    Inadequate Allegations of Defendants' Personal Involvement in the Claimed Violations

Where a prisoner brings a Section 1983 claim against only individual defendants, as Plaintiff has done here, the prisoner must allege that the individual defendants were directly and personally involved in the alleged constitutional deprivations.  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994); *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991).  In the absence of such allegations, a Section 1983 claim will not survive a motion to dismiss.  *Wright*, 21 F.3d at 501; *see also Costello v. City of Burlington*, 632 F.3d 41, 48–49 (2d Cir. 2011) (following *Wright*); *Rivera v. Bloomberg*, 11 Civ. 629 (PGG) and 11 Civ. 4325 (PGG), 2012 U.S. Dist. LEXIS 121686, at *29-30 (S.D.N.Y. Aug. 27, 2012) (holding that, "where a complainant names a defendant in the caption but the complaint contains no substantive allegation against the defendant, dismissal . . . is appropriate" (internal quotation marks and citation omitted)).

A defendant can be personally involved in a Section 1983 violation, if

> (1)    the defendant participated directly in the alleged constitutional violation,
>
> (2)    the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong,
>
> (3)    the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom,
>
> (4)    the defendant was grossly negligent in supervising subordinates who committed the wrongful act, or

(5)     the defendant exhibited deliberate indifference to the rights
of inmates by failing to act on information indicating that
unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 .3d 865, 873 (2d Cir. 1995) (citations omitted).

In actions where prison officials are defendants, as they are in this case, their "[m]ere presence in the 'prison chain of command' is not sufficient to demonstrate personal involvement for purposes of [Section] 1983." *Rivera*, 2012 U.S. Dist. LEXIS 121686, at *25 (citing *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985) (*per curiam*)). Nor may liability for damages in a Section 1983 action be based on the doctrines of *respondeat superior* or vicarious liability. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). Moreover, the "mere receipt of a letter or similar complaint," without more, is not enough to demonstrate an official's personal involvement; if it were, "it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose respondeat superior liability." *Rivera*, 2012 U.S. Dist. LEXIS 121686, at *25 (quoting *Johnson v. Wright*, 234 F. Supp. 2d at 363-64).

Here, Plaintiff fails to set forth the personal involvement of Defendants in the incidents or the prison conditions giving rise to his claims. Certainly, Plaintiff does not allege that any of Defendants directly participated in any of the alleged constitutional violations, created a policy or custom under which any of the alleged violations occurred, or were "grossly negligent in supervising subordinates who committed the [alleged] violation[s]." *Rahman v. Fisher*, 607 F. Supp. 2d 580, 585 (S.D.N.Y. 2009) (citing *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007)). Rather, Plaintiff solely alleges that "the Brass of the . . . facilities have been verbally notified about the current situation[] and nothing has been done. . . . [and] Commsioner

19

Dora B. Schriro has been notified as well."  (Compl., at 6; *see also* Dkt. 26, at 3 (Plaintiff stating that "[t]he whole 12 months at Rikers Island I have dealing with [d]eliberate indifference").)

As noted above, however, "it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."  *Greenwaldt v. Coughlin*, No. 93 Civ. 6551 (LAP), 1995 U.S. Dist. LEXIS 5144, at *11 (S.D.N.Y. Apr. 19, 1995) (citations omitted); *see also Walker*, 2002 U.S. Dist. LEXIS 7067, at *43; *Rivera v. Goord*, 119 F. Supp. 2d at 344 (finding that inmate's allegations that he wrote to prison officials and was ignored insufficient to hold those allegedly non-responsive officials liable under Section 1983); *Woods v. Goord*, No. 97 Civ. 5143 (RWS), 1998 U.S. Dist. LEXIS 16664, at *18 (S.D.N.Y. Oct. 21, 1998) ("Receiving letters or complaints . . . does not render [prison officials] personally liable under § 1983."); *Watson v. McGinnis*, 964 F. Supp. 127, 130 (S.D.N. Y. 1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability.").  Thus, even if Defendants received notice of Plaintiffs' grievances and failed to act upon them, this alone would not be sufficient to establish supervisory liability.  "Were it otherwise, virtually every prison inmate who sues for constitutional torts by [prison officials] could name the [supervisor] as a defendant since the plaintiff must pursue his prison remedies, and invariably the plaintiff's grievance will have been passed upon by the [supervisor]."  *Rivera*, 2012 U.S. Dist. LEXIS 121686, at *31-32 (internal quotation marks and citations omitted).

As Plaintiff has not alleged the personal involvement of Defendants in the alleged constitutional violations, his Complaint, absent adequate repleading, would be subject to dismissal on that ground.

B.    **Inadequate Allegations of a Constitutional Violation**

Liberally construed, Plaintiff's Complaint seeks to plead constitutional violations by claiming, *inter alia*, that his conditions of confinement violated consent decrees or other orders entered by Judge Lasker, as well as City prison regulations, and that the conditions were so egregious as to violate his Eighth or 14th Amendment rights to the basic necessities of life. Plaintiff also complains of body searches that he apparently claims were an unconstitutional violation of his religious liberty.  Several of Plaintiff's potential claims simply cannot be maintained; others may be viable, if adequately repleaded.

1.    **Violations of the Consent Decrees and**
**Other Orders Entered by Judge Lasker**

As to Plaintiff's apparent allegations that his housing conditions violated certain court orders, it is this Court's understanding that Plaintiff is referring to the consent decrees and supplemental court orders entered by Judge Lasker in *Benjamin v. Horn*, No. 75 Civ. 3073 (S.D.N.Y.), and certain related cases.  One of those orders, dated June 23, 1981, prohibited overcrowding at Rikers by affording each detainee in a dormitory 75 square feet of housing space.  Approximately 15 years later, however, the PLRA was enacted and the defendants in *Benjamin* moved to terminate the consent decrees and related orders pursuant to provisions of the Act.

At that point, *Benjamin* and the related cases were no longer before Judge Lasker, as they had been reassigned to the Honorable Harold Baer, Jr.  Beginning on August 30, 2000, Judge Baer began issuing a series of orders that terminated numerous provisions of these consent decrees and orders.  *See Benjamin v. Fraser*, 161 F. Supp. 2d 151, 153-54 (S.D.N.Y. 2001) (detailing procedural history), *aff'd in relevant part*, 343 F.3d 35 (2d Cir. 2003).  One such order,

dated December 15, 2000, terminated, *inter alia*, the June 23, 1981 order regarding

overcrowding.  *See id.* at 154 n.4 (discussing three orders that were previously terminated,

including an order regarding overcrowding, dated June 23, 1981).  Another such order

terminated provisions in the consent decrees regarding laundry and food services.  *See id.*

at 109-10 (terminating provisions of the consent decrees with respect to, *inter alia*, food service,

personal hygiene, and laundry, as the court found no ongoing violation of federal law).

After Judge Baer issued the aforementioned orders, courts in this district have dismissed

claims brought by detainees who continued to claim that overcrowded prison conditions or

inadequate laundering services had violated the original consent decrees and orders of

Judge Lasker.  *See, e.g., Patterson*, 2012 U.S. Dist. LEXIS 113235, at *7-11.  Here, too,

Plaintiff's claims that are based on violations of these now-terminated consent decrees and

orders cannot stand, and any such claims should be dismissed with prejudice.

### 2.    Violations of "Minimum Standards" Set by New York City Regulations

Based on the parties' submissions, it appears that Plaintiff is also alleging that Defendant

violated 40 R.C.N.Y. § 1-04(c)(3), which provides that "[a] multiple-occupancy area shall

provide a minimum of one operable toilet and shower for every 8 prisoners and one operable

sink for every 10 prisoners" and that "[t]oilets shall be accessible for use without staff assistance

24 hours per day."  Plaintiff appears to claim that this New York City prison regulation

establishes "minimum standards," which, if they are violated, give rise to a Section 1983 claim.

Plaintiff, however, does not have a viable federal claim based on a purported violation of this

regulation.

22

Pursuant to Section 1983, a detainee may bring a lawsuit in federal court against local government officials for violations of his federal rights.  42 U.S.C. § 1983.  That private right of action extends to "the deprivation of any rights, privileges, or immunities secured by the Constitution and [federal] laws."  42 U.S.C. § 1983; *see also City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 180, (1997).  Violations of state prison regulations, however, are not, in themselves, violations of federal rights.  *See Patterson*, 2012 U.S. Dist. LEXIS 113235, at *12 (citing *Edwards v. Johnson*, 209 F.3d 772, 779 (5th Cir. 2000); *Hovater v. Robinson*, 1 F.3d 1063, 1068 n.4 (10th Cir. 1993)).

Although a state may, in some cases, create a liberty interest for detainees that is enforceable under the Due Process Clause of the federal Constitution, *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 461 (1989), such a liberty interest is created only where a state law, regulation or directive places "'substantive limitations on official discretion,'" *id*. at 462 (citing *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983)).  A sate or local regulation may do this by, for example, "using explicit mandatory language," such as "shall," or "creating substantive predicates that limit official decision-making and mandate a particular outcome after relevant criteria have been met."  *Patterson*, 2012 U.S. Dist. LEXIS 113235, at *12-13 (citing *Kentucky Dept. of Corrections*, 490 U.S. at 462-63).

Here, none of the alleged deprivations rise to the level of a violation of a protectable liberty interest.  What Plaintiff describes as the City regulations' "minimum standards" do not create substantive predicates that limit the exercise of official discretion.  For instance, to the extent any City regulations involve "hygiene, overcrowding and recreation," which are directly at issue here, those regulations "do not have substantive predicates that would require prison officials to maintain those standards."  *See Patterson*, 2012 U.S. Dist. LEXIS 113235, at *12-13

23

(finding the "minimum standards" associated with hygiene, overcrowding, and recreation did not create substantive predicates that limited the exercise of discretion and were not implicated by plaintiff's allegations) (citing 40 R.C.N.Y. §§ 1-03, 1-04, 1-06).  On this basis alone, courts have dismissed so-called "minimum-standards" claims that are based on violations of these regulations.  *See, e.g., id.* 13-14.  So, too, should Plaintiff's claims be dismissed, with prejudice, to the extent they are premised on an alleged violation of any City regulation.

### 3.   "Deliberate Indifference" Claims

Regardless of whether the conditions of his confinement violated any court order or regulation, Plaintiff appears to claim that Defendants violated his federal constitutional rights by being deliberately indifferent to allegedly unsanitary and unsafe living conditions he faced while in the three Rikers facilities.  (*See* Compl., at 4-6; Dkt. 26, at 3 (Plaintiff stating that he has been "dealing with [d]eliberate indifference").)  Plaintiff clearly cannot maintain certain of these claims, but others might survive, if adequately repleaded.

Although Plaintiff nowhere explicitly states this, the Court assumes that, during the period he was held at the Rikers detention centers, he was a pretrial detainee, rather than a convicted prisoner.  (*See* Compl., at 11 (Plaintiff stating that he was an "Islamic detainee"); *see, e.g.*, *Patterson*, 2012 U.S. Dist. LEXIS 113235, at *15 n.5 (assuming, for purposes of deciding defendant's motion to dismiss, that plaintiff was a pretrial detainee, where plaintiff failed to allege this explicitly, but did allege that he was sent to a dormitory "'full of other detainees'")).

The Due Process Clause of the 14th Amendment requires that a pretrial detainee not be punished.  *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979).  Where a pretrial detainee challenges the conditions of his confinement under the 14th Amendment, as Plaintiff does here, "the proper

inquiry is whether those conditions amount to punishment of the detainee." *Bell*, 441 U.S. at

535.  In order to resolve such an inquiry, a court must decide whether the restrictions or

conditions at issue "are rationally related to a legitimate nonpunitive governmental purpose and

whether they appear excessive in relation to that purpose." *Id*. at 561.  "[G]enuine privations and

hardship over an extended period of time might raise serious questions under the Due Process

Clause as to whether those conditions amounted to punishment." *Id*. at 542.

 As "[t]he due process rights of a pretrial detainee are at least as great as the Eighth

Amendment protections available to a convicted prisoner," *Cnty. of Sacramento v. Lewis*, 523

U.S. 833, 849-50 (1998) (quoting *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244

(1983)), a prison official's indifference to the serious medical needs of a prisoner violates both

the Eighth Amendment rights of sentenced prisoners and the 14th Amendment rights of pretrial

detainees, *Lewis*, 523 U.S. at 850.  Pretrial detainees who assert claims that defendants were

deliberately indifferent to a serious threat to their health or safety must meet the Eighth

Amendment standard, which requires the detainees to show that defendants were "both aware of

facts from which the inferences could be drawn that a substantial risk of serious harm existed,

and also drew the inference." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009).

 On the other hand, where pretrial detainees challenge the constitutionality of the

environmental conditions of their confinement – and not discrete decisions made by prison

officials – deliberate indifference "may generally be presumed from an absence of reasonable

care." *Benjamin*, 343 F.3d at 49 (quoting *DeShaney v. Winnebago County Dep't of Soc. Servs.*,

489 U.S. 189, 199-200 (1989)) (internal quotation marks and additional citation omitted); *see*

*also Caiozzo*, 581 F.3d at 70 (discussing the difference between challenging one discrete

decision and challenging a protracted failure to provide safe prison conditions).  Thus, where a

pretrial detainee alleges "a *protracted* failure to provide safe prison conditions, the deliberate indifference standard does not require the detainees to show anything more than actual or imminent substantial harm." *Benjamin*, 343 F.3d at 51.[8]

### a.   Overcrowded Living Conditions

Plaintiff's allegations that he was subjected to overcrowded living conditions fail to state a due process violation.  As noted above, Plaintiff alleges that the AMKC, the OBCC, and the GMDC each exceeded its intended limits on the number of detainees it housed, that none provided sufficient space for beds, and that each provided an insufficient number of operable sinks, toilets and showers for its actual population.  (*See* Background *supra* at (A)(1) (citing Compl., at 4, 9).)  Plaintiff, however, pleads no facts plausibly suggesting that the purported overcrowding at these facilities caused him to suffer a physical injury.  Nor does Plaintiff assert that he endured the allegedly overcrowded living conditions for an extended period of time.

Overcrowding amounts to punishment only when a pretrial detainee is subjected "over an extended period to genuine privations and hardship not reasonably related to a legitimate governmental objective." *Lareau v. Manson*, 651 F.2d 96, 103 (2d Cir. 1981).  "The question is one of degree and must be considered in light of the particular circumstances in each case." *Id.* at 103; *see also Bell*, 441 U.S. at 542 (stating that detainees do not have due process rights to "one man, one cell"); *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981) (concluding that double-celling of prisoners, where prison population was 38% above design capacity, did not

---

[8] In contrast, post-conviction inmates challenging the conditions of their confinement would be required to show wantonness on the part of a prison official or that the "alleged conditions were so inhumane as to constitute cruel and unusual punishment." *Harris v. Westchester County Dep't of Corr.*, No 06 Civ. 2011 (RJS), 2008 U.S. Dist. LEXIS 28372, at *18-19 n.6 (S.D.N.Y. Apr. 2, 2008) (citing *Iqbal v. Hasty*, 490 F.3d 143, 169 (2d Cir. 2007)).

violate the Eighth Amendment).[9]  Courts in this circuit have repeatedly dismissed detainees' due process claims based on the type of overcrowding allegations made here.  Indeed, courts have rejected virtually identical claims, based on precisely the type of overcrowding conditions that Plaintiff challenges, at the same facilities.  *See, e.g.*, *Myers v. City of New York*, No.11 Civ. 8525 (PAE), 2012 U.S. Dist. LEXIS 123994, at *18-19 (S.D.N.Y. Aug. 29, 2012) (dismissing plaintiff's due process claim where plaintiff, a pretrial detainee at OBCC, alleged that he was subjected to overcrowded living conditions, that he was one of 60 inmates housed in a certain OBCC facility, that he shared five toilets and five sinks with the other inmates, and these conditions violated "minimum City standards").  So, too, Plaintiff's allegation that he was subjected to overcrowding and provided with an insufficient number of sinks, toilets, and showers, without more, fails to reach the level of a violation of his constitutional due process rights.  As this claim cannot be rendered viable by amendment, I recommend that it be dismissed with prejudice.

### b.   Inadequate Food

Plaintiff's allegations that, while he was detained the AMKC, the OBCC, and the GMDC, he was served freezer-burned food, sometimes on dirty trays, without fruit, and that he was subjected to shortages of butter and eating utensils (*see* Background *supra* at (A)(3) (citing Compl. at 4, 6)) also fail to state a due process violation.  While a substantial deprivation of food may amount to punishment, *see Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983), and the provision of only one meal a day may amount to a violation of constitutional rights,

---

[9] Moreover, as stated above, the violation of minimum City standards as to occupancy does not, on its own, violate Plaintiff's constitutional due process rights.  (*See* Discussion *supra* at III(A)(2); *see also Brown v. Plata*, 131 S. Ct. 1910, 1947 (2011) ("[C]ourts must not confuse professional standards with constitutional requirements.").)

*Cunningham v. Jones*, 567 F.2d 653, 659-60 (6th Cir. 1977), Plaintiff makes no such claims.  He simply complains that his meals were poorly prepared and did not always include butter and/or fruit.  (Compl. at 4, 6.)  Moreover, he neither alleges that he was deprived of nutrition nor that he suffered a physical injury as the result of the food he was given.  This does not amount to a violation of the Due Process Clause, nor does it appear that Plaintiff would be able to remedy the defects in this claim by repleading.  Accordingly, I also recommend that this claim be dismissed with prejudice.

### c. <u>Lack of Access to Laundry Service and Clean Linens</u>

Plaintiff has also failed to plead a due process violation regarding laundry services.  As set out above, Plaintiff alleges that the facilities in which he was housed failed to launder prisoner's clothing, to provide detergent, to allow prisoners to dry their clothing on "homemade" clotheslines, or to wash the prisoners' sheets and towels on a weekly basis.  (*See* Background *supra* at (A)(3) (citing Compl., at 4, 9).)  Under the Constitution, prisoners are, in fact, entitled to clothing and linens that are clean, or to the opportunity to clean such items themselves, *Benjamin*, 161 F. Supp. 2d at 178 (collecting cases); *Patterson*, 2012 U.S. Dist. LEXIS 113235, at *23-24, but Plaintiff's allegations regarding his laundry, as pleaded, are insufficient to raise a plausible inference that he suffered a deprivation of constitutional magnitude.

First, as to Plaintiff's allegations that the facilities failed to wash the prisoners' sheets and towels on a weekly basis (Compl., at 9), Plaintiff fails to allege an objectively serious deprivation.  *See Hallett v. Davis*, No.11 Civ. 4646 (WHP), 2012 U.S. Dist. LEXIS 137819, at *10-11 (finding that plaintiff, a pretrial detainee at GMDC, failed to allege plausibly that the alleged discomforts caused by defendant's failure to clean plaintiff's blanket every three months, failure to clean plaintiff's mattress every six months, and failure to change plaintiff's clothes

twice a week constituted objectively serious deprivations claims).  Plaintiff's claims that the AMKC and the GMDC failed to give him a pillow and a mattress cover are similarly deficient. *See id.*  Thus, these claims should be dismissed with prejudice.

Second, although Plaintiff claims that the facilities ceased to provide laundry service and failed to provide him with detergent, he does not allege that he was also denied any alternate opportunity or means to clean his linens and clothing himself.  (*See* Compl., at 4.)  In fact, where bar soap and access to a sink is provided to pretrial detainees, as it may have been in this case, the requirements of the relevant constitutional requirements are satisfied.  *Benjamin*, 161 F. at 178-79 (holding that pretrial detainees' due process rights were not violated where bar soap was available to prisoners so that they could clean clothes in a sink).  As Plaintiff has not alleged that the Rikers detention centers failed to provide him with any means to wash his linens and clothing, he has not sufficiently pleaded a constitutional violation at this time.  As to this claim, however, I recommend that, in lieu of dismissal at this stage, Plaintiff be granted leave to amend his pleading, in the event he is able to allege, with greater specificity, that he was deprived of any means by which to obtain clean clothing and/or linens.

### d.   <u>Inadequate Footwear</u>

Plaintiff's allegation that his prison-issued shoes wore out within two weeks of the date he received them, had no arches, and did little to protect him against rain and cold (Compl. at 9) are not sufficiently serious to state a due process violation.  As one court recently noted, "courts in this Circuit have consistently found that pain and other problems resulting from being forced to wear institutional footwear are not sufficiently serious to" to satisfy the objective prong of the deliberate indifference standard.  *Stevens v. City of New York*, No. 12 Civ. 3808 (JMF), 2013 U.S. Dist. LEXIS 2851, at *8-9 (S.D.N.Y. Jan. 8, 2013) (citations omitted).  Here, Plaintiff has

not alleged that his prison-issued shoes caused him to suffer physical injury.  Yet, even if he

were to replead to add such an allegation, it appears that he would be unable to state a viable

constitutional claim, as "pinched nerves, sores, calluses, bleeding heels, and back and leg

problems, do not 'offend contemporary standards of decency,' or 'pose an unreasonable risk of

serious damage to [plaintiff's] future health,'" *id*. at 9 (citing *Martin v. City of N.Y.*, No. 11 Civ.

600 (PKC) (RLE), 2012 U.S. Dist. LEXIS 56632, at *22 (S.D.N.Y. Apr. 20, 2012).  Given the

precedent on this point, I recommend that this claim be dismissed with prejudice.

### e. <u>Lack of Access to the Gym</u>

Plaintiff's claim that detainees were denied access to the gym during inclement weather

does not state a due process violation.  Although exercise has been recognized as a human need

protected by the Constitution, *Wilson v. Seiter*, 501 U.S. 294, 304,(1991) (Eighth Amendment);

*Lareau*, 651 F.2d at 100, 104 (14th Amendment), "there is no constitutional right to exercise

indoors," *Patterson*, 2012 U.S. Dist. LEXIS 113235, at *21 (concluding that plaintiff's

allegation that pretrial detainees at OBCC, including plaintiff, "were made to have outdoor

recreation even in heavy snow and rain" did not state a due process violation).

> No doubt indoor exercise space would be useful to assure
> opportunity for vigorous exercise during inclement weather . . . .
> However, []an occasional day without exercise when weather
> conditions preclude outdoor activity [is not] cruel and unusual
> punishment. With outdoor recreation space provided and
> opportunity for its daily use assured, the absence of additional
> exercise space indoors and of recreational equipment for use in the
> outdoor space is not a denial of constitutional rights.

*Anderson v. Coughlin*, 757 F.2d 33, 36 (2d Cir. 1985).  Accordingly, I recommend that this

claim also be dismissed with prejudice.

f.   **Exposure to Harmful Water**

Plaintiff contends that, as a result of his exposure to unsafe water during his periods of detention at AMKC, the OBCC, and the GMDC, his due process rights were violated.  More specifically, as set out above, Plaintiff claims that the showers and drinking fountains at these facilities produced "greyish water, which, according to Plaintiff, caused him to develop "boils," "burns," "stomach pains," and "headaches."  (*See* Background *supra* at (A)(2) (citing Dkt. 27, at 3).)  Courts in this circuit have analyzed such claims under the Eighth Amendment standard, which, as a threshold matter, requires that "the deprivation alleged by the [pretrial detainee] must be in objective terms 'sufficiently serious' such that the deprivation 'den[ied] the minimal civilized measure of life's necessities.'"  *Branham v. Meachum*, 77 F. 3d 626, 630-31 (2d Cir. 1996) (quoting *Wilson v. Seiter*, 501 U.S. 294 (1991)); *see, e.g.*, *Rivera v. Bloomberg*, Nos. 11 Civ. 629 (PGG) and 11 Civ. 4325 (PGG), 2012 U.S. Dist. LEXIS 121686, at *10-13 (S.D.N.Y. Aug. 27, 2012) (applying the Eighth Amendment standard to pretrial detainees' allegation that, while detained at the GMDC and the OBCC, they were forced to consume unsafe and unsanitary water).

Courts have repeatedly held that "[w]ater that is suitable for drinking and bathing is undeniably one of 'life's necessities,' and . . . the Eighth Amendment therefore requires that it be supplied to inmates."  *Bellezza v. Fischer*, No. 05 CIV. 98 (DLC), 2006 U.S. Dist. LEXIS 76962, at *10 (S.D.N.Y. Oct. 24, 2006) (citing *LaBounty v. Coughlin*, 137 F.3d 68, 72 (2d Cir. 1998)); *see Cruz v. Jackson,* No. 94 Civ. 2600 (RWS), 1997 U.S. Dist. LEXIS 1093, at *19-20 (S.D.N.Y. Feb. 4, 1997) ("Because contaminated water may pose serious health problems, an allegation that prison officials persistently provided only rusty drinking water would satisfy the objective component of an Eighth Amendment claim."); *Donahue v. Conn. Dep't of Corr.*,

No. 3:1 l-cv-656 (CFD), 2011 U.S. Dist. LEXIS 105447, at *4 (D. Conn. Sept. 16, 2011) ("potable water constitutes a basic human need").

In this case, if the water provided to the Plaintiff was, as he appears to allege, contaminated and could not be used for drinking or bathing without causing the physical symptoms he describes, this would certainly be "objectively sufficiently serious" to raise the prospect of a constitutional violation. *See Bellezza*, 2006 U.S. Dist. LEXIS 76962, at *10. Plaintiff, however, has failed to allege the length of his exposure to this water, or whether, at particular facilities, the problem of water contamination arose in a discrete incident or for a protracted period of time. (*See* Discussion *supra* at III(B)(3).)  Plaintiff also has not alleged what particular symptoms he developed, at which facility, as a result of his exposure to and/or consumption of, contaminated water, and he has not alleged personal involvement on the part of specific Defendants in failing to provide clean water. (*See* Background *supra* at (A)(2).)  Thus, this Court cannot discern, from Plaintiff's Complaint, whether he may have a viable claim for deliberate indifference, with respect to any of three facilities.  Under the circumstances, and because Plaintiff may be capable of stating a constitutional claim regarding a lack of clean water, I recommend that the Court afford him an opportunity to replead this claim in greater detail.

**g**.     **Other Dangerous Environmental Conditions**

According to Plaintiff, his due process rights were violated as a result of his being subjected to unsanitary living conditions and housed in dilapidated facilities.  As set out above, these alleged conditions included infestation by vermin and contamination of bathroom fixtures with unremoved clogs of bodily waste and vomit. (*See* Background *supra* at (A)(1) (citing Compl., at 4, 9).)  Plaintiff also claims that the ceilings at the OBCC and the GMDC leaked foul-smelling, dirty water, causing fragments of plaster to fall from the ceilings, and that rust and

dust were prevalent throughout the AMKC, making the air hard to breathe and causing prisoners to suffer "headaches, sore throats, allergic reactions, itchy skin, [and] dry eyes."  (*See id*. (citing Compl., at 4, 9, 11).)

Reading the Complaint liberally, Plaintiff asserts that these environmental conditions of his confinement amounted to "a protracted failure to provide safe prison conditions," *Benjamin*, 343 F.3d at 49 (citations omitted), and, thereby, were violative of his constitutional rights. Where such a claim is adequately pleaded, deliberate indifference "may generally be presumed from an absence of reasonable care."  *Id*.  Moreover, as noted above, where a pretrial detainee alleges "a *protracted* failure to provide safe prison conditions, the deliberate indifference standard does not require the detainees to show anything more than actual or imminent substantial harm."  *Benjamin*, 343 F.3d at 51.

In *Harris v. Westchester County Dep't of Corr.*, No 06 Civ. 2011 (RJS), 2008 U.S. Dist. LEXIS 28372, at *17-18 (S.D.N.Y. Apr. 2, 2008), the court held that plaintiff had sufficiently pleaded a violation of his due process rights arising from the living conditions of his prison cell. The court was persuaded by the fact that, in his complaint, the plaintiff had specifically identified the allegedly unsafe condition:  "the ceiling of his cell leak[ed] when it rain[ed], and, on December 16, 2005, this leak created a puddle of water on the floor [of his cell] that allegedly caused plaintiff to slip-and-fall," *id*. at 17, that the condition posed an obvious risk, *id*. at 18, and that plaintiff alleged that he had repeatedly notified defendants of the allegedly dangerous condition but his complaints were ignored, *id*.; *see also Ingram v. Steel*, No. 04 Civ. 5918 (DLC), 2006 U.S. Dist. LEXIS 56472, at *10 (S.D.N.Y. Aug. 15, 2006) (finding that plaintiff had sufficiently pleaded a living conditions claim where "the only specific condition she identifie[d]" was "'a large hole' in the shower area that had been covered over with plywood")

33

In this case, by comparison, while Plaintiff describes having been exposed to extremely unpleasant conditions, he fails to allege that he, personally, suffered "actual harm" as a result of these conditions. Although Plaintiff's allegations may, at some point, have demonstrated "imminent substantial harm," Plaintiff is apparently no longer detained at these facilities, and he has failed to state the length of his exposure to these allegedly dangerous environmental conditions. Consequently, even liberally construing his allegations, this Court cannot determine whether Plaintiff is seeking to plead that, during the period of his detention at any particular facility, he was subjected to "a *protracted* failure to provide safe prison conditions." *Id.* In addition, as stated above, Plaintiff has not alleged the personal involvement of Defendants (*see* Discussion *supra* at III(A)), nor has he clearly alleged whom he notified of the conditions at issue, and, therefore, it is unclear who, if anyone, may have been deliberately indifferent to these conditions.

In light of the severity of the allegations underlying this claim, the claim might be viable, if adequately repleaded. *See Edwards v. City of New York*, No. 08 Civ. 05787 (PGG), 2009 U.S. Dist. LEXIS 74940, at *8 n.3 (S.D.N.Y. Aug. 24, 2009) ("Courts have allowed claims to proceed beyond a motion to dismiss in cases where pre-trial detainees alleged that harmful environmental conditions had been extant for a lengthy period of time or had repeatedly complained of a harmful condition to no avail."). Accordingly, I recommend that Plaintiff be given the opportunity to replead this claim, to add further factual allegations.

### 4.   Destruction of Plaintiff's Outgoing Mail

Plaintiff asserts that the mail-room staffs of the three Rikers facilities destroyed certain outgoing mail items that were sent by detainees, as the staffs were allegedly concerned that those mail items contained information regarding the conditions at these facilities (presumably the

34

conditions described in the Complaint).  (*See* Compl., at 4.)  Plaintiff, however, does not

specifically allege that any of *his* mail was destroyed or tampered with in any way.  Moreover,

he neither states the frequency at which these alleged acts of destruction occurred nor

specifically identifies even one individual as having engaged in the claimed misconduct.

Finally, Plaintiff does not allege even a single instance where a legal document that he submitted

for mailing failed to reach its intended destination.[10]

Under the First Amendment, prisoners  have a right to "the free flow of incoming and

outgoing mail."  *Johnson v. Goord*, 445 F.3d 532, 534 (2d Cir. 2006) (internal citation omitted).

As courts have attempted to balance the competing interests implicated when facilities place

restrictions on prison mail, the courts have "consistently afforded greater protection to legal mail

than to non-legal mail."  *Id.*  Even so, a prisoner's right to receive and send mail may be

regulated.  *Id.*; *see also Davidson v. Mann*, 129 F.3d 700, 702 (2d Cir. 1997) (upholding the

validity of a prison regulation limiting inmates' purchases of stamps for non-legal mail).

Regulation of prisoner mail "is valid if it is reasonably related to legitimate penological

interests."  *Johnson*, 445 F.3d at 534.  On the other hand, "as few as two incidents of mail

tampering could constitute an actionable violation (1) if the incidents suggested an ongoing

practice of censorship unjustified by a substantial government interest, or (2) if the tampering

unjustifiably chilled the prisoner's right of access to the courts or impaired the legal

representation received."  *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (citing

*Washington v. James*, 782 F.2d 1134, 1139 (2d Cir. 1986)).

---

[10] As an aside, the Court notes that, in this case, it has received numerous mailings from
Plaintiff – including during the time that he was detained at Rikers – and that Plaintiff has not
reported any difficulties in sending out these mailings.

In this case, Plaintiff fails to allege facts plausibly suggesting that any Defendant took

actions, with regard to Plaintiff's mail, that were so numerous and/or severe as to either (1) rise

to the level of a regular or ongoing interference with Plaintiff's incoming or outgoing legal mail,

or (2) chill Plaintiff's right of access to the courts or legal representation.  As Plaintiff may be

able to allege such facts, he should be afforded leave to replead, prior to the dismissal of his

claim.  *See Davis v. Goord*, No. 01-0116, 2003 U.S. App. LEXIS 13030, at *11-12 (2d Cir.

Feb. 10, 2003) (holding that the district court should have given plaintiff leave to amend his

complaint to attempt to allege an injury, where plaintiff's allegations of two instances of mail

interference were neither sufficient to state a claim for denial of access to the courts nor

sufficient to state a constitutional claim for violating his right to send and receive legal mail).

### 5.   Body Searches Claimed To Be an Impermissible Impingement on Plaintiff's Religious Practices

Plaintiff alleges that he was "stripped frisk[ed]" on January 7 and 9, 2012 (*see* Compl.,

at 11), and also alleges that, on unspecified dates, he was "forced to stip bare during pat frisks"

(*id*.).  Plaintiff appears to assert that his constitutional rights were violated by these strip and pat

frisks because they violated his Islamic faith (*see id*. at 11), and he points to "Directive 4910" to

support his claim that the searches to which he was subjected were impermissible (*id*. at 4).[11]

Directive 4910, however, does not appear to address the question of whether an Islamic detainee

---

[11] Directive 4910, which is integral to Plaintiff's Complaint and thus may be considered on Defendants' Rule 12(b)(6) motion, defines a "strip frisk" as "a search of an inmate's clothes and body[,] including body cavities," *i.e.*, the inmate's mouth, anus, and, for a female inmate, her vagina.  (*See* Def. Mem., Ex. A (Directive 4910), at 3; *see also Gomez v. Coughlin*, 685 F. Supp. 1291, 1299 n.5 (S.D.N.Y. 1988).)  The same Directive generally defines as a "pat frisk" as "a search by hand of an inmate's person and his or her clothes while the inmate is clothed, except that the inmate shall be required to remove coat, hat, and shoes."  (Def. Mem., Ex. A, at 2.)

may be strip searched, and Plaintiff has done nothing more to spell out the basis for his claim

that the searches violated his rights.

As an initial matter, Plaintiff has not identified which of his constitutional rights were

supposedly violated by the searches he references.  Plaintiff has not also identified any

individual who personally frisked him, or who allegedly played any role in the establishment of

any policy or practice that resulted in Plaintiff's being frisked.  Plaintiff also has not described

what role, if any, the named Defendants had in subjecting him to any body searches.  Based on

these types of pleading deficiencies, courts in this circuit have dismissed similar claims based on

allegedly unconstitutional searches.  *See, e.g.*, *Rowser v. Desousa*, 11 CV 5526 (BSJ) (AJP),

2012 U.S. Dist. LEXIS 134858, at *9-10 (S.D.N.Y. Sept. 17, 2012) (finding that plaintiff had

failed to state a claim against a defendant correction officer, where plaintiff, *inter alia*, failed to

make clear which of his constitutional rights were allegedly violated by that defendant);

*Brummell v. Stewart*, No. 09 Civ. 10326 (PAC) (FM), 2011 U.S. Dist. LEXIS 40156, at *8

(S.D.N.Y. Mar. 24, 2011) (dismissing plaintiff's claim against defendant, where plaintiff, a

detainee at OBCC, failed to allege that defendant was personally involved in an allegedly illegal

strip search of plaintiff), *report and recommendation adopted by* 2011 U.S. Dist. LEXIS 62112,

at *7-8 (S.D.N.Y. June 10, 2011).

In addition, to the extent Plaintiff rests his claim on any purported violation of Directive

4910, his reliance on this Directive is misplaced.  At all times relevant to his Complaint, Plaintiff

was in the custody of the New York City DOC (*see* Compl., at 2), but Directive 4910 is a policy

of the New York State Department of Correctional Services, not the DOC (*see* Def. Mem. Ex. A;

*cf. Smith v. Taylor*, 217 Fed. App'x 97, 98 (2d Cir. 2007) (referring to Directive 4910 as a a

directive of the "New York State Department of Corrections")). Thus, this Directive presumably did not govern the conduct of the officers at the facilities where Plaintiff was housed.

In any event, if Plaintiff had alleged a violation of an applicable DOC directive or regulation,[12] and even if he had pleaded that Defendants played some specific role in that violation, such allegations, without more, would be still insufficient to state a federal constitutional claim. As a general matter, violations of state or local prison regulations, do not, in themselves, constitute violations of federal rights. *See Patterson*, 2012 U.S. Dist. LEXIS 113235, at *12 (citing *Edwards*, 209 F.3d at 779; *Hovater*, 1 F.3d at 1068 n.4). Also, a strip frisk, in particular, will "pass constitutional muster, even if the strip frisk is conducted without probable cause, so long as the search is reasonable and not abusive." *Shabazz v. Pico*, 994 F. Supp. 460, 473 (S.D.N.Y. 1998); *see also Rowser*, 2012 U.S. Dist. LEXIS 134858, at *10 (quoting *Shabazz*). Thus, in order to maintain a federal claim, an inmate challenging a strip search must ultimately meet the burden of establishing that the search at issue was unreasonable, *Shabazz*, 994 F. Supp. at 473 (internal quotations omitted), and for such a claim to survive a motion to dismiss, the plaintiff must plead facts sufficient to give rise to a plausible inference that the search was not reasonably related to legitimate penological interests.[13]

A plaintiff who challenges the constitutionality of a strip frisk on the basis of his Muslim faith, as Plaintiff appears to do here, is not relieved of the obligation to plead facts sufficient to

---

[12] Although none of the parties' submissions mention a comparable DOC directive, this Court notes that the DOC appears to have a directive that sets forth a policy regarding searches of detainees. (*See* Directive #4508R-E, Control and Search for Contraband, dated 5/15/09.)

[13] In this regard, it makes no difference whether a plaintiff is a convicted prisoner or a pre-trial detainee, as, in either case, the constitutionality of the search would depend on its reasonable connection to penological interests. *See Covino v. Patrissi*, 967 F.2d 73, 78 n.4 (2d Cir. 1992) (citing *Washington v. Harper*, 494 U.S. 210, 223 (1990)).

suggest that the frisk was unreasonable or abusive, as "[t]he religious tenets of the Muslims in

the prison setting must give way to penological and security requirements of the prisons."

*Hurley v. Ward*, 549 F. Supp. 174, 186 (S.D.N.Y. 1982).  Here, Plaintiff's bare allegations that

he is "an Islamic detainee" and that he was strip-searched do not, in themselves, plausibly

suggest unconstitutional conduct.  Although this claim is therefore subject to dismissal, *see*

*Lesane v. City of New York*, No. 11 Civ. 2104 (HB), 2011 U.S. Dist. LEXIS 127292, at *7-8

(S.D.N.Y. Nov. 3, 2011) (dismissing strip-search claim where plaintiff had "fail[ed] to allege

facts sufficient to show thta the searches were unreasonable, that they failed to serve a

reasonable penological goal, or that they were intended to intimidate, harass or punish him"), I

recommend that Plaintiff be given the opportunity to replead this claim, in the event there are

facts that would support an inference that the searches about which he complains were

unreasonable or undertaken for an illegitimate purpose.

### C.     Inadequate Allegations of Physical Injury, To Support Claim for Compensatory Damages

In this case, Plaintiff seeks $180,000 in compensatory damages and an unstated amount

of punitive damages, for the conduct and conditions described above.  (*See* Compl., at 6.)

Defendants, however, contend that, even if Plaintiff's allegations are true, he would not be

entitled to any such relief, as he has failed to allege that Defendants' alleged misconduct caused

him to suffer even a single physical injury.  (*See* Def. Mem., at 24-25.)

Defendants point out that, under the PLRA, "[n]o Federal civil action may be brought by

a prisoner . . . for mental or emotional injury suffered while in custody without a prior showing

of physical injury."  (*See* Def. Mem., at 24 (quoting 42 U.S.C. § 1997e(e); 42 U.S.C.

§ 1997e(e)).  In the section of his Complaint entitled "Injuries," Plaintiff states:  "mental and

emotional deprivation from poorly prepared food by facilit[ies], living in unhygenic [sic] housing areas, being forced to strip bare during frisk searches, [and]. . . . verbal [and] psychological abuse from staff."  (Compl., at 4.)  This section of the Complaint, however, is devoid of any explicit allegation regarding a physical injury.  (*See id*.)  Further, while Plaintiff's Complaint alleges that the air in the AMKC was "stifling and hard to breathe," leading to "headaches, sore throats, allergic reactions, itchy skin, [and] dry eyes" (*id*. at 11), the Complaint does not clearly allege that Plaintiff, personally, suffered any physical reaction to the contaminated air described therein (*see id*.).  At most, in his opposition submission, Plaintiff alleges that, as a result of his exposure to water in one or more of the facilities in which he was housed, he developed "boils," "burns," "stomach pains," and "headaches."  (Dkt. 27, at 3.)  Even there, however, Plaintiff does not specify what ailment or ailments he developed, at what time, and at which facility, as a result of his exposure to contaminated water.

Where pre-trial detainees have brought claims seeking compensatory damages for mental and emotional injuries, but have failed to allege accompanying physical injuries, courts in this circuit have dismissed those claims on that basis alone.  *See, e.g.*, *Bouknight v. Shaw*, No. 08 Civ. 5187 (PKC), 2009 U.S. Dist. LEXIS 35402, at *17-18 (S.D.N.Y. Apr. 6, 2009) ("Because plaintiff [a pre-trial detainee at Riker's Island] has not alleged that he suffered any physical injury in connection with defendants' alleged infliction of emotional distress, his claims seeking compensatory damages for mental or emotional injuries must be dismissed under the PLRA."); *Hare v. Hayden*, No. 09 Civ. 3135 (RWS), 2011 U.S. Dist. LEXIS 40683, at *21 (S.D.N.Y. Apr. 14, 2011) ("Plaintiff's claim fails because she does not allege that she suffered any physical injury." (citing *Bouknight*)).  Here, with the possible exception of Plaintiff's claims that are based on his exposure to allegedly harmful water, Plaintiff's claims are similarly flawed, as they

40

all seek damages solely for mental or emotional injuries.  Accordingly, if Plaintiff seeks to maintain his claims for compensatory damages, he should be afforded the opportunity to replead his claims to set out any allegations of physical injury, and to tie those claimed injuries to the conduct or conditions at issue.  To the extent he is unable to do so, his claims for compensatory damages should be dismissed.

## IV.   **LEAVE TO REPLEAD**

A court may dismiss the claims of a *pro se* litigant without leave to amend, when "the substance of the claim pleaded is frivolous on its face," *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) (citing *Moorish Sci. Temple v. Smith*, 693 F.2d 987, 990 (2d Cir. 1982)), in that it is "based on an indisputably meritless legal theory," *Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (*per curiam*) (internal quotation marks and citation omitted).  As noted above, though, the Court should not dismiss any potentially viable *pro se* claims, without first giving the plaintiff leave to amend, to try to cure any pleading defects.  *See Branum*, 927 F.2d at 705.

For the reasons discussed above, I recommend that the Court dismiss, with prejudice, each of the following claims, as these claims are inherently defective under the applicable caselaw, and their defects cannot be cured by amendment:

1.      any claims premised on alleged violations of either the consent decrees and orders of Judge Lasker or any City regulations regarding "minimum standards" for conditions of confinement; and

2.      deliberate indifference claims based on (a) overcrowding, (b) inadequate food, (c) any alleged failure to provide clean linens on a weekly basis, or to provide him with a pillow and mattress cover, (d) inadequate footwear, and (e) lack of access to a gym.

41

I further recommend that, prior to dismissal, Plaintiff be given 30 days to replead his claims of:

1.  deliberate indifference claims based on (a) the denial of
    access to the means to wash clothing and linens,
    (b) exposure to harmful water, (c) exposure to vermin
    infestation, (d) exposure to clogged and contaminated
    bathroom fixtures, and (e) exposure to rust and
    contaminated air; and

2.  Destruction of outgoing legal mail.

Plaintiff should be instructed that, if he timely files an amended pleading, it should be titled "Amended Complaint," and it should name as defendants all individuals or entities that were allegedly involved in the deprivation of his federal rights.  For each asserted claim, Plaintiff should also be instructed that he will need to specify (a) which facility was involved, (b) when, and for how long, Plaintiff was exposed to any allegedly unlawful conditions of confinement, (c) if discrete incidents are being challenged, the number of such incidents and when they occurred, (d) the nature of any personal, physical injury Plaintiff suffered as a result of any of the alleged constitutional violations, (e) the nature of each named defendant's personal involvement in the alleged constitutional violation, including whether (and how) each defendant knew or should have known about any challenged conditions of the facilities, and (f) the type of relief that Plaintiff seeks on his claims.[14]

---

[14] In his Complaint, Plaintiff only asserted claims for monetary damages, not injunctive relief, and the Court notes that, at this point, any potential claim for injunctive relief would likely have been mooted by Plaintiff's transfer out of Rikers.  For a federal court to retain jurisdiction over a case, an actual controversy must exist "at all stages of review, not merely at the time the complaint is filed."  *Prins v. Coughlin III*, 76 F.3d 504, 506 (2d Cir. 1996) (quoting *Preiser v. Newkirk*, 422 U.S. 395, 402 (1975)).  "A case is deemed moot where the problem sought to be remedied has ceased, or where there is 'no reasonable expectation that the wrong will be repeated.'"  *Id.* (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953)).  Under this reasoning, an incarcerated plaintiff's transfer out of the prison facility at which his cause of

Plaintiff should also be instructed that his amended complaint will completely replace the original Complaint, and that, while it should *not* include any claims that the Court dismisses with prejudice, it should contain all of the information necessary to make a short, plain statement explaining why the Plaintiff is entitled to relief against each named defendant, on any remaining claims.

Finally, I recommend that, if Plaintiff fails to file, by the deadline set by the Court, an amended complaint that cures the defects described herein, his remaining claims (or any remaining claims that are still defective) be dismissed with prejudice, at that time. To the extent Plaintiff's amended pleading is sufficient to allow this case to proceed, then the parties should proceed with discovery under this Court's supervision, with an initial focus on the question of whether the exhaustion requirement of the PLRA should be excused in this case.

## CONCLUSION

For all the foregoing reasons, I respectfully recommend that Defendants' motion to dismiss the Complaint (Dkt. 12) be granted in part and denied in part, as set forth above. I further recommend that Plaintiff's motion to convert Defendants' motion to one for summary judgment (Dkt. 26) be denied as premature.

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have 14 days from the date of this Report and Recommendation to file written objections. *See also* Fed. R. Civ. P. 6(a) and 6(d) (allowing three additional days

---

action arose moots his claim against that facility, insofar as it seeks injunctive and declaratory relief. *See id.* (where inmate had been transferred to third facility, his request for injunctive relief against first and second facilities was moot); *accord Young v. Coughlin*, 866 F.2d 567, 568 n.1 (2d Cir. 1989). An action for monetary damages, however, is not mooted by a transfer. *Prins*, 76 F.3d at 506.

where service has been made by mail).  Such objections, and any responses thereto, shall be filed

with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable

Paul A. Crotty, United States District Judge, 500 Pearl Street, Room 735, New York, New York

10007, and to the chambers of the undersigned, 500 Pearl Street, Room 1660, New York, New

York 10007.  Any requests for an extension of time for filing objections must be directed to

Judge Crotty.  FAILURE TO OBJECT WITHIN 14 DAYS WILL RESULT IN A WAIVER OF

OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.  *Thomas v. Arn*, 474 U.S. 140

(1985); *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v.

Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 57-59 (2d

Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

      If Petitioner does not have access to cases cited herein that are reported only on [Westlaw

and/or LEXIS], he may request copies from Respondents' counsel.  *See* Local Civ. R. 7.2

("Upon request, counsel shall provide the *pro se* litigant with copies of [cases and other

authorities cited therein that are unpublished or reported exclusively on computerized databases]

as are cited in a decision of the Court and were not previously cited by any party.").

Dated:  New York, New York
       February 15, 2013

                                  Respectfully Submitted,

                                    DEBRA FREEMAN
                                  United States Magistrate Judge

**<u>Copies to</u>**:

Hon. Paul A. Crotty, U.S.D.J.

Mr. Marquise Simmons
# 12R3368
Upstate Correctional Facility
P.O. Box 2001
Malone, NY 12953

Defendants' counsel (via ECF)